IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| SANDRA L. CRAWFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 05-5039-CV-SW-ODS |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION DENYING BENEFITS**

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying her application for disability benefits. The Commissioner's decision is affirmed.

I. BACKGROUND

Plaintiff was born in September 1948, completed the ninth grade, and has prior work experience as a cook, factory worker, and laborer. She filed an application for benefits on November 13, 2002, alleging she was disabled effective January 15, 2002, due to anxiety attacks and depression. The application was initially denied on January 15, 2003.

In 2002, Plaintiff was seeing Dr. Danette Bowles for difficulties with her leg and her heart. On April 23, 2002, Plaintiff complained of anxiety and stress and was prescribed Paxil. R. at 189. During a visit in June, Plaintiff reported she had not suffered any anxiety attacks while on Paxil, and her prescription was refilled. R. at 188. On August 19, Plaintiff complained of feeling "edgy," and Dr. Bowles increased her dosage

of Paxil. R. at 187. One month later, Plaintiff indicated her anxiety levels had stabilized. R. at 186.

Plaintiff also obtained treatment at the Ozark Center, primarily from Dr. Peter Ferguson, a psychiatrist. On January 16, 2003 – the day after Plaintiff's claim was initially denied --she admitted herself for "voluntary detox" due to her history of alcohol abuse. R. at 273. One week later, Plaintiff told Dr. Ferguson that she had not been drinking and was "looking for work daily – no luck." She described herself as feeling "fidgity," nervous, irritable and unable to sleep well. Dr. Ferguson observed "at least she's sober!" and prescribed Ambien and Lexapro. R. at 272. On February 5, Plaintiff again reported she was looking for work every day. She described herself as depressed since at least the age of nineteen and indicated the medication Dr. Ferguson prescribed was not working. He increased the dosage of Lexapro and added additional medications to her regimen. R. at 271. Two weeks later, Plaintiff reported experiencing crying spells and continued depression – and also reported that she "still can't find work." Dr. Ferguson altered her medications. R. at 270.

On March 12, Plaintiff reported that the medicine was working; she felt less fidgity and was sleeping better. She also reported she was still looking for a job. R. at 269. On March 31, Plaintiff told Dr. Ferguson she thought that because she stopped drinking she could now stop taking her medicine; consequently, the time since her last visit was not "too good." Dr. Ferguson indicated Plaintiff "obviously needs meds" and re-issued prescriptions. R. 268.

Plaintiff next saw Dr. Ferguson on May 12, 2003. She reported finding a job as a cook, which made her feel better. However, Dr. Ferguson also noted Plaintiff had not been compliant with her medication. R. at 303. On July 3, Plaintiff was "seemingly better" and still working. R. at 302. She missed some appointments and next saw Dr. Ferguson on October 6, 2003; by then, she had lost her job because she "just kind of blew up" at work. However, Plaintiff told Dr. Ferguson she "feels better when working." He continued her medications. R. at 301. During her December 29 appointment, Plaintiff

reported that she had been appointed co-guardian for her brother, but she was still irritable because she could not find work "even as a dishwasher." R. at 300. On February 10, 2004, Plaintiff reported increased stress due to her caretaking obligations for her brother and bouts of "free-floating anxiety," but "denies hopelessness, denies helplessness" and no panic attacks. Plaintiff also told Dr. Ferguson she had used some of her brother's Paxil and it made her feel better, so in addition to the other medications he prescribed Paxil for her. R. at 298. Unfortunately, the Paxil did not help Plaintiff, and two weeks later Dr. Ferguson discontinued her use. She also reported feeling "like she's about to go crazy - wishes she didn't need pills." She was continuing to look for a job without success. R. at 297. On March 15, she began a prescription of Zoloft. R. at 296.

While seeing Dr. Ferguson, Plaintiff was also seeing Dr. Lester Bickford for her physical ailments. She first saw Dr. Bickford on March 13, 2003, and included depression and nervousness among her complaints. R. at 293. On March 27, Dr. Bickford diagnosed Plaintiff as suffering from post traumatic stress disorder ("PTSD") and menopausal syndrome and indicated she "definitely needs [to follow up] with Dr. Ferguson." R. at 291. In April, Dr. Bickford indicated Plaintiff's PTSD was "no better" and encouraged her to seek social security benefits. He did not prescribe Plaintiff any medication for PTSD, anxiety or stress, leaving such decisions to Dr. Ferguson. R. at 290. On June 2, Plaintiff reported that she was working as a cook; she also did not report any problems with anxiety, PTSD, or stress. R. at 289. However, two weeks later she again complained of feeling depressed. R. at 288. No mention was made of these problems in her visits on August 18, September 22, or November 26. R. at 284-86.

Doctors Bickford and Ferguson prepared Medical Source Statements. On March 31, 2002, Dr. Ferguson prepared a Medical Source Statement - Mental indicating Plaintiff was markedly limited, *inter alia*, in her ability to understand remember short, simple instructions, maintain attention and concentration, maintain attendance and punctuality, make simple work-related decisions, get along with others, and maintain

socially appropriate behavior. He also indicated Plaintiff was extremely limited in her ability to understand, remember and carry out detailed instructions, work in near others without being distracted, interact with the public appropriately, accept instruction and criticism from supervisors appropriately, and respond to changes in the work setting. The statement is a "check the box" form and does not include any narrative. R. at 275-76. Dr. Ferguson reiterated these (or substantially similar) observations in statements prepared on October 6, 2003, and April 7, 2004. R. at 281-82, 305-06. On April 25, 2003, Dr. Bickford prepared a Medical Source Statement - Physical indicating Plaintiff suffered from few physical limitations. He also wrote that Plaintiff's "problems are not due to physical factors but she has <u>severe</u> PTSD." R. at 278-79.

During the hearing, Plaintiff testified that she looks for work every other day but is not eligible for unemployment benefits due to her low earnings in the past. R. at 328. Her efforts to find work included checking with the same employer "at least 25 times in six months" and checking the newspaper every day. R. at 328-29. She left her job as a cook in a nursing home because one of the residents was stealing and Plaintiff was angry at the administrator's failure to take any action. R. at 329-30. In addition to looking for work, Plaintiff spends her time painting her house and working in the yard. R. at 330-31. She has no hobbies and does not like to go out in public, although she does her own shopping. R. at 331. Within the last month she began experiencing crying spells. R. at 331-32. She will also "get really down because I can't find a job" and has difficulties sleeping. R. at 332.

The ALJ elicited testimony from a Medical Expert, Dr. Sofia Khan. Doctor Khan was certified in internal medicine, but not psychiatry. R. at 334. She described Plaintiff's condition as including non-severe high blood pressure that was controlled with medication and non-severe chronic obstructive lung disease exacerbated by her cigarette use. R. at 335. Dr. Khan also observed the diagnoses for post traumatic stress disorder/anxiety attacks and alcohol abuse and dependence. R. at 335. She suggested Plaintiff's residual functional capacity should exclude exposure to fumes and odors, but suggested no limitations on Plaintiff's ability to sit, stand or walk. R. at 336. With respect to

4

Plaintiff's medical condition, Dr. Khan testified that, excluding the effects of alcohol at the time Plaintiff filed her application, Plaintiff was mildly limited in her activities of daily living and concentration. R. at 336-37. Since ceasing use of alcohol, Plaintiff's episodes of anxiety and depression increased, but Dr. Khan believed Plaintiff could still perform simple repetitive tasks in a forty hour workweek. R. at 337. She also observed there was nothing in Dr. Ferguson's treatment notes to justify his Medical Source Statements' indications of marked and extreme limitations. R. at 338-39.

The ALJ also elicited testimony from a Vocational Expert ("VE"), who was asked to assume an individual of Plaintiff's age, education and work experience who needed to avoid dust and fumes, was limited to performing simple, repetitive tasks and could have no more than occasional contact with the public, supervisors, or co-workers. The VE testified that such an individual could perform work in the national economy. R. at 342-43. The VE was then asked to assume the same limitations except that the individual had to completely avoid working with the public. The VE testified that such a person could also find work in the national economy. R. at 344. Finally, the VE testified that a person limited in a manner and degree described by Dr. Ferguson could not find work. R. at 344.

The ALJ discounted Dr. Ferguson's assessments because they were unsupported by his treatment notes, inconsistent with the number of times he saw Plaintiff, and otherwise unexplained. The ALJ also found his conclusions were inconsistent with Plaintiff's actual employment from May to September 2003. While this employment was deemed an unsuccessful work attempt and not substantial gainful activity, the ALJ viewed her ability to perform work for approximately five months to be inconsistent with the nature and severity of the limitations indicated on Dr. Ferguson's Medical Source Statements. The ALJ also discounted Plaintiff's testimony because it was inconsistent with other evidence in the record.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

Opinions of treating physicians are entitled to deference, but only if they are supported by diagnostic data and consistent with the record as a whole. E.g., Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999). Doctor Ferguson was Plaintiff's treating psychiatrist, but the opinions expressed in his Medical Source Statements were not consistent with his own treatment records, let alone the administrative record as a whole. His notes do not reflect anything Plaintiff said to him that supported the degree of limitations he indicated on the Medical Source Statements, he did not conduct a mental status limitation, and at no time did his treatment notes suggest Plaintiff was as limited as he described on the Medical Source Statements. At times, Plaintiff's depression was amenable to treatment (particularly with Paxil). At other times, Plaintiff's depression seemed to be caused by her inability to *find* work, thus leaving her to essentially contend she is depressed because she cannot find a job and she should get benefits because she is depressed. However, this reduces to the conclusion that she should get benefits because she cannot find a job, which is not a basis for awarding benefits.

Plaintiff argues the ALJ was obligated to contact Dr. Ferguson and obtain clarification of the inconsistencies. The Court disagrees. The ALJ is obliged to fairly develop the record, and in this case Dr. Ferguson's records were solicited and those

6

records he submitted were reviewed and considered.  The presence of inconsistencies does not require continued and potentially never-ending dialogues with medical practitioners; if it did, cases such as Haggard could not exist.  The ALJ is obligated to resolve conflicts in the record; to the extent those conflicts require medical expertise the ALJ may (as was done in this case) consult with a medical expert.  However, the ALJ is not obligated to ask a treating doctor to explain inconsistencies between two separate reports prepared by the doctor, particularly when one of the reports (the Medical Source Statement) is totally devoid of any support or explanation.

The ALJ was also justified in discounting Plaintiff's subjective complaints.  Indeed, crediting Plaintiff's testimony would not provide a basis for concluding she is unable to work.  As intimated above, she testified (and told Dr. Ferguson) she was depressed when she could not find work; this does not make her unemployment-induced depression disabling.  She described herself as capable of engaging in a wide range of activities with certain limitations; when those limitations were incorporated in hypothetical questions posed to the VE, the ALJ learned there were jobs Plaintiff could perform.  Finally, the ALJ was entitled to consider Plaintiff's employment and her continued efforts to obtain employment.  Plaintiff contends she should not be penalized for undergoing these "heroic" efforts, but the ALJ did more than simply conclude her efforts disqualified her from receiving benefits.  The ALJ observed Plaintiff's ability to work was inconsistent with both her testimony and Dr. Ferguson's opinion about Plaintiff's limitations.  Indeed, Plaintiff left her job for reasons unrelated to her alleged disabilities and held the position for much longer than should be expected if Plaintiff was as limited as Dr. Ferguson suggested.

Viewed as a whole, the record supports the ALJ's decision that Dr. Ferguson's Medical Source Statements were both inconsistent with the treatment notes and other records he provided and unsupported by any evidence in the record.  The details of Plaintiff's testimony do not support a conclusion she is disabled, and her generalized contentions are not supported by the record.

7

### III. CONCLUSION

The Commissioner's final decision denying benefits is affirmed.

IT IS SO ORDERED.

DATE: November 7, 2005

/s/ Ortrie D. Smith
ORTRIE D. SMITH, JUDGE
UNITED STATES DISTRICT COURT